| | |
|---|---|
| DAMON SCOTT, | |
| Petitioner, | |
| v. | 3:07 - CV- 1420 (CSH) |
| COMMISSIONER OF CORRECTION, | |
| Respondent. | |

**RULING ON PETITION FOR WRIT OF HABEAS CORPUS**

HAIGHT, Senior District Judge:

Petitioner Damon Scott, an inmate currently confined at the MaDougall-Walker Correctional Institution[1] and proceeding *pro se*, brings this action against the Connecticut Commissioner of Correction ("respondent") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Scott challenges his state court conviction for one count of manslaughter in the first degree with a firearm, in violation of Connecticut General Statutes § 53a-55a(a). Specifically, Scott alleges that he was denied the effective assistance of counsel during pretrial proceedings, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, in that his attorney failed to perform an adequate investigation into his potential claim of self-defense. Scott claims that consequently his guilty plea was not entered as a knowing, intelligent, and voluntary plea and he should thus be

---

[1]The MacDougall-Walker Correctional Institution is a level 4/5, high/maximum security level facility for adult males located at 1153 East Street, South, Suffield, Connecticut.

allowed to withdraw it.  For the reasons set forth below, the Court will DENY Scott's petition.

I.      **PROCEDURAL BACKGROUND**

On March 3, 2000, Damon Scott was arrested and charged with the shooting murder of Delmore Epps**.**  The charge was laid in the Connecticut Superior Court for the Judicial District of Fairfield at Bridgeport, Doc. No. CR99-147673.   Attorney Alexander Schwartz was appointed as a special public defender to represent Scott in the case**.**  Doc. #20, Ex. N (Transcript of state habeas corpus hearing (herein "Habeas Transcript"),  5/25/2005), p. 5, l. 4-8; p. 38, l. 14-22.

Schwartz negotiated a plea agreement with the State upon behalf of Scott, under which the State agreed to  file a substitute information, charging Scott with manslaughter in the first degree with a firearm in violation of Connecticut General Statutes § 53a-55a (a).[2]  Also pursuant to the plea agreement, the State agreed to request a cap of thirty-five  years of incarceration and to allow Scott to retain the right to argue for a shorter term of incarceration at sentencing.   Scott accepted the agreement and, on January 26, 2000, pled guilty to the substitute information in open court.  Doc. #20, Ex. L (Transcript of Plea), p. 3-15.   At that time, state Superior Court Judge George M. Thim questioned Scott directly to ensure that his plea was knowing, voluntary, and made with the assistance of competent counsel.  *Id.*, p. 14, l. 27; to p. 15, l. 14.   Judge Thim then accepted the plea

---

[2]Connecticut General Statutes § 53a-55a(a) states in full:

(a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

2

and continued the matter for presentence investigation.[3]  *Id.*, p. 15, l. 24  to p. 16, l. 5.  A pre-sentence investigation report was prepared thereafter by the Connecticut Judicial Department Office of Adult Probation.  Doc. #20, Ex. R (Pre-Sentence Investigation Report in the  matter of  *State v. Damon Scott*, Doc. No. CR99-147673).

On March 17, 2000, Scott appeared for sentencing and Schwartz argued for a sentence of twenty years, stating that  "[t]his was a case in which I believe there was a viable and justified claim of self-defense that could have been raised at trial."  Doc. #20, Ex. M (Sentencing Transcript, 3/17/2000), p. 19, l. 12-15.  Schwartz clarified that Scott was willing to accept the plea despite his claim of self-defense due to the uncertainty of how a jury might perceive such a defense.[4]  *Id.,* l. 15-20.  The Court thereafter sentenced Scott, in accordance with the plea agreement, to the custody of the Commissioner of Correction for a term of thirty-five years of incarceration.  *Id.*, p. 23, l. 23-26.

On November 28, 2003, Scott filed a *pro se* petition for writ of habeas corpus in the Connecticut Superior Court, Judicial District of  Tolland at Rockville.  *See Scott v. Warden*, No.

---

[3]Judge Thim questioned Scott to determine whether Scott agreed that he shot Epps on the night in question and whether Scott understood that the plea agreement called for a sentence of thirty-five  years with the right to argue for less.  Scott answered in the affirmative both times. Doc. #20, Ex. L (Transcript of Plea), p. 13, l. 5-7; p. 14, l. 3-7.  Judge Thim then asked Schwartz if he was satisfied that Scott's plea was "voluntarily, knowingly made;" and Schwartz replied positively.  *Id.*, p. 15, l. 15-20,   The court then accepted the plea as "voluntarily, understandingly made, with the assistance of competent counsel."  *Id.*, p. 15, l. 23 to p. 16, l. 1.    The Court further noted that a factual basis had been made for the plea.  *Id.*

[4]Schwartz explained to Judge Thim at sentencing that he and his client did not "know what a jury would have done [with respect to the self-defense claim].  And in large part that's why, when Mr. Kelly [the prosecutor] agreed that a plea to manslaughter with a right to argue for less would be appropriate in this case, Mr. Scott decided to place his life before [the court]." Doc. # 20, Ex. M (Sentencing Transcript, 3/17/2000), p. 19, l. 15-20.

CV03-0004278-S (Writ of Habeas Corpus, filed 12/17/2003). Replacement counsel, Sebastian O. DeSantis, was subsequently appointed to represent Scott. DeSantis then filed an amended petition on Scott's behalf, alleging ineffective assistance on the part of predecessor counsel, Schwartz. Doc. #20, Ex. B (Amended Petition, dated 1/17/2004, Doc. No. CV03-4278-S). Specifically, Scott's amended petition alleged that Schwartz "(a) [m]isled [Scott] regarding a theory of self-defense; (b) [f]ailed to investigate and interview witnesses that would allow for a self-defense theory at trial; and, (c) [m]isinformed [Scott] regarding the time that [he] would serve in prison." Doc. #20, Ex. B, ¶ 6 (a)-(c). In sum, the Amended Petition averred that Schwartz "failed to ensure that [Scott's] plea was knowing, intelligent, and voluntary." *Id.,* ¶ 7.

On September 28, 2005, after two hearings on the merits, the state habeas court, the Honorable Stanley T. Fuger, Jr., denied relief on the petition. *Scott v. Warden*, No. CV03-4278-S, 2005 WL 2851559 (Conn. Super. Ct. Sept. 28, 2005). On March 27, 2007, the Connecticut Appellate Court dismissed Scott's appeal in a one-line *per curiam* opinion;[5] and on May 8, 2007, the Connecticut Supreme Court denied certification to appeal.[6] Scott did not thereafter seek *certiorari* from the United States Supreme Court.

On October 15, 2007, Scott initiated the present action by filing his petition for a writ of habeas corpus in this Court. Doc. #1. The respondent thereafter filed a motion to dismiss the action (Doc. #15), contending that Scott's petition was barred by the one-year statute of limitations set

---

[5]*See Scott v. Commissioner of Correction*, 100 Conn. App. 902 (App. Ct. 2007).

[6]*See Scott v. Commissioner of Correction*, 282 Conn. 915 (2007).

forth in 28 U.S.C. § 2244(d)(1)(A).[7]  This Court issued a ruling on December 10, 2008 (Doc. #19),

granting in part and denying in part the motion to dismiss.

Specifically, the Court held that all of Scott's alleged ineffective assistance of counsel

allegations were barred as untimely except one:  his ineffective assistance of counsel claim *based

on his counsel's lack of investigation of his self-defense claim*.   The date upon which Scott actually

discovered the basis for that claim, namely that his trial counsel allegedly made misrepresentations

regarding investigation into Scott's self-defense claim,  was also the date on which it could have

been discovered through the exercise of due diligence.[8]  Therefore, that portion of Scott's claim –

*alleging  ineffective assistance of counsel based upon counsel's alleged misrepresentations

regarding his  investigation into a potential self-defense claim* –  qualified for equitable tolling

under 28 U.S.C. § 2244(d)(1)(D) (permitting federal habeas petition to be filed within one year of

"the date on which the factual predicate of the claim or claims presented could have been discovered

through the exercise of due diligence").   Accordingly, the Court allowed that portion of Scott's

claim to proceed and ordered  respondent to  address the merits of that remaining claim.  Respondent

---

[7]The Antiterrorism and Effective Death Penalty Act ("AEDPA"), the statute governing federal habeas relief,  imposes a one-year limitation period for filing a federal habeas corpus petition by a person in custody pursuant to the judgment of a state court.  *See* 28 U.S.C. § 2244(d)(1).  Section 2244(d)(1)(A) specifies that the "limitation period shall run from the latest of  –  (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."

[8]Scott asserted in his reply to Respondent's Motion to Dismiss that, in pleading guilty, he relied on Schwartz's representations that Schwartz had interviewed the witness Chaka Fagon and that Fagon had nothing exculpatory to contribute.  Doc. #17, p. 5- 6.  Scott maintained that, in October 2003, his sister, Toni Scott, had a chance encounter with Fagon and learned that Fagon did in fact have information to support Scott's innocence but that Schwartz had never contacted Fagon. *Id.*  Scott then filed his state habeas petition, alleging ineffective assistance of counsel, the following month.

complied with the Court's order, filing a Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus on February 10, 2009. Doc. #20.

## II.     FACTUAL BACKGROUND

The following facts have been drawn from the record, including the pleadings and transcripts of hearings, in state court.

### A.     General Summary

On February 2, 1999, at approximately 12:30 a.m., the Bridgeport Police Department received a call that a shooting had occurred at the Greene Homes Apartments, located at Highland Avenue, in Bridgeport, Connecticut.[9]  When police officers arrived at the scene, they discovered the body of Delmore Epps, who had been fatally shot.[10]  Epps's brother told the police officers that he had driven the victim to the housing complex that night to purchase drugs.  Epps had disappeared into the lobby of one building and then, five to ten minutes later, shots rang out and a man wearing a camouflage jacket (*i.e.*, Scott) was seen fleeing the scene.  Epps's brother stated that he attempted to drag Epps back to his car but, upon discovering that Epps was dead, fled in fear "that he might get shot."[11]  Doc. #20, Ex. P (Application For Arrest Warrant and supporting Affidavit of Bridgeport

---

[9]The Court takes judicial notice that Charles F. Greene Homes, located at Highland Avenue in Bridgeport, Connecticut, is a seven story, high-rise complex of five buildings comprised of 268 units.

[10]The police reports indicated and the autopsy confirmed that Epps was struck by four of the ten shots that were fired at him.  Doc. #20, Ex. M (Sentencing Transcript), p. 3, l. 17-21 and p. 22, l. 7-9; Ex. P (Application for Arrest Warrant), ¶¶ 2 (a)-(b).

[11]Witnesses at the scene reported seeing a man carrying a gun and dragging Epps's body away from the scene. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 43, l. 16-21.

Police Sergeant Thomas Lula), p. 4, para. 2.

A witness named Chaka Fagon claimed that earlier on the same evening, he and others were robbed at the Greene Homes Apartments. Doc. #20, Ex. O (Deposition of Chaka Fagon), p. 4, l. 16-23. Fagon testified under oath that Delmore Epps was the "ringleader" of the robbers, the "one giving the commands." *Id.*, p. 4, l. 25 to p. 5, l. 12. According to Fagon, Epps struck Fagon with a weapon during the course of the robbery, using either an M-1 or an M-16 rifle.[12] *Id.*, p. 5, l. 13-18; p. 6, l. 15-19.

Scott claims that after the robberies described by Fagon, Scott walked through an area of the Green Homes Apartments complex and was confronted by Epps. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 6, l. 17-21. Scott testified that he had learned of the earlier robberies and saw Epps carrying a rifle at his side as he approached. *Id.*; *see also id.*, p. 7, l. 26 to p. 8, l. 17. Scott claimed that he was afraid for his life, fearing that Epps was going to shoot and rob him, so Scott shot Epps and fatally wounded him.[13] *Id.*, p. 8, l. 10-12.

The next afternoon, police observed Scott crossing a bridge near Congress Street in Bridgeport, Connecticut, and arrested him for possessing a pistol without a permit, interfering with police, and possessing a stolen weapon. *See* Doc. #20, Ex. Q (Statement of Damon Scott to

---

[12]Statements by Fagon regarding the kind of weapon that Epps possessed – "either an M-16 or either an M-1 rifle" – may have led Judge Fuger to discredit his testimony. Doc. #20, Ex. N (Habeas Transcript, 8/22/2005), p. 6, l. 15-19. As Assistant State's Attorney Gerard Eisenman pointed out to Judge Fuger at the hearing in which Fagon's deposition was admitted, "your Honor, having been in the military, knows there's a great difference between what an M-16 looks like and what an M-1 looks like. . . . [One] couldn't possibly mistake the two guns." *Id.*, p. 5, l. 13-25.

[13]Scott admitted at the sentencing hearing that he had previously sold narcotics at the Greene Homes Apartments. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 26, l. 27 to p. 27, l. 5.

Bridgeport Police Department, 2/2/1999).  The weapon in Scott's possession at that time was the

gun used to shoot Epps.  Upon  performing additional investigation, the police thereafter pursued

an arrest warrant and charged Scott with Epps's murder on March 3, 2000.

As stated *supra*, Attorney Alexander Schwartz was appointed to represent Scott as a special

public defender.  On January 26, 2000, pursuant to a plea agreement, Scott entered a plea of guilty

to the charge of manslaughter.[14]  Doc. #20, Ex. L (Transcript of Plea, 1/26/2000).  After thoroughly

questioning both Scott and Schwartz, Connecticut Superior Judge George Thim determined that the

plea was "voluntarily,  understandingly made, with the assistance of competent counsel" with a

factual basis.  *Id.*, p. 15, l. 24 to p. 16, l. 1.

On March 17, 2000, Judge Thim sentenced Scott, in accordance with the terms of the plea

agreement, to thirty-five years of incarceration.[15]  Doc. #20, Ex. M (Sentencing Transcript), p. 23.

l. 23-26.  Scott subsequently contended that the sentence confused him because he believed that the

thirty-five-year sentence would be suspended after twenty years.  Thereafter, with the assistance of

new counsel, Scott initiated his quest for habeas  relief in state court, specifying a variety of ways

in which Schwartz failed to provide him with the effective assistance of counsel.  *Id.*, Ex. B

(Amended Petition for Writ of Habeas Corpus, 1/17/2004).

Having been denied relief in state habeas court, dismissed on appeal to the Connecticut

---

[14]The plea agreement specified a sentence cap of thirty-five years with a right to argue for
a shorter sentence.   Scott, however, contends that Schwartz told him that the agreement called
for a sentence of thirty-five years, suspended after twenty years.   This particular allegation is
barred by the statute of limitations set forth in 28 U.S.C. §2244(d)(1) and is thus not the subject
of Scott's pending petition for federal habeas relief.

[15]Scott was born on May 3, 1981, making him 18 years old on March 17, 2000, the date
of sentencing.  Doc. #20, Ex. A (Mittimus, dated 3/17/2000). Under that sentence, he will be 53
years old when released from prison after thirty-five years.

Appellate Court, and denied certification by the Connecticut Supreme Court, Scott now seeks relief in federal court. Due to the bar of the statute of limitations set forth at 28 U.S.C. §2244(d)(1), all of Scott's claims regarding the ineffective assistance of Schwartz are barred except the claim that Schwartz misrepresented to Scott that he actually investigated the viability of Scott's self-defense claim when, Scott maintains, Schwartz had not performed such an investigation.

### B.    Testimony at State Habeas Hearing - 5/25/2005

#### 1.    Schwartz

On May 25, 2005. at a hearing conducted by Superior Court Judge Stanley T. Fuger, Jr. on Scott's habeas corpus claim, Schwartz was questioned extensively regarding the extent of his experience as a criminal trial counsel and his representation of Scott. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 38-54. During that testimony, Schwartz stated that he began practicing law in 1983, between thirty and fifty per cent of his practice was comprised of criminal cases, and that he had tried between forty-five and fifty criminal matters, ranging from larceny in the sixth degree to a capital felony. *Id.*, p. 47, l. 2-13.

With respect to the crime at issue, Schwartz testified that the State claimed that Scott had shot Epps with a handgun, firing ten shots in total, four of which actually struck Epps. *Id.*, p. 39, l. 23-37. Upon receiving disclosure from the State of police reports, autopsy reports, and witness statements, Schwartz learned that earlier on the evening of February 2, 1999, witnesses observed Epps and his brother robbing drug dealers at the Green Homes Apartments complex. *Id.*, p. 41, l. 2-7. Schwartz hired an investigator, Carl DeProfio of Case Research International, provided DeProfio with a copy of the disclosed materials, and asked him to interview the witnesses named in

9

those reports. *Id.*, p. 41, l. 8-13. Schwartz explained that the reason he hired an investigator, as opposed to speaking to the witnesses himself, was to create the option of calling DeProfio to the stand in the event he needed to impeach one of the interviewed witnesses at trial. *Id.*, p. 50, l. 14-20. Schwartz did, however, recall speaking personally to one named witness, Chaka Fagon, because Schwartz represented Fagon's brother. *Id.*, p. 41, l. 22 to p. 42, l. 1.[16]

Schwartz testified that Scott had initially attempted to create a false alibi to "put himself elsewhere at the time of the homicide." *Id.*, p. 42, l. 23 -25. When, however, the police investigated that alibi, they determined that Scott's girlfriend would not "corroborate in full everything that [Scott] had stated in his statement to the police." *Id.*, p. 42, l. 25 to p. 43, l. 3. Schwartz concluded that, due to the false nature of Scott's alibi, the only viable defense at trial was a claim of self-defense. *Id.*, p. 42, l. 14 to p. 43, l. 2. Therefore, by the time he received the State's disclosure materials, Schwartz discussed the possibility of a self-defense claim with Scott. *Id.*, p. 48, l. 18 to p. 49, l. 14. Schwartz stated that he explained the two issues arising under a self-defense claim: (1) whether Scott reasonably believed that he faced deadly physical force and (2) whether Scott could have retreated from Epps in complete safety.[17] *Id.*, p. 49, l. 17-21. As part of this discussion,

---

[16]Schwartz's testimony that he actually spoke with Fagon was corroborated by his earlier statement at Scott's sentencing that, had the case gone to trial, he would have shown that Epps was robbing people in the Greene Homes Apartments complex on the night of his death and that, during one such robbery, Epps "hit one of the people he was robbing with a gun." Doc. # 20, Ex. M (Sentencing Transcript), p. 16, l. 25 to p.17, l. 6. Had he not spoken with Fagon, it is unlikely that Schwartz would have known that Epps allegedly hit one of the robbery victims (*i.e.*, Fagon) with a gun. *Id.*, p. 17, l. 4-6.

[17]Connecticut General Statutes § 53a-19, describes the circumstances under which one may properly employ the "[u]se of physical force in defense of person," as follows:

(a) Except as provided in subsections (b) and (c) of this section, a person is
justified in using reasonable physical force upon another person to defend himself

Schwartz evaluated the nature and effect of the witness statements at issue and the possibility that the jury would believe one version of events over another. *Id.*, p. 49, l. 21-23. Schwartz believed that Scott understood what he had been told regarding the self-defense claim. *Id.*, p. 49, l. 15 to p. 50, l. 8

With respect to flaws in the self-defense claim, Schwartz testified that a witness statement by a Mr. Jamar Jones, contained in the arrest warrant, stated that Scott had told Jones that he knew that Epps did not have a gun.[18] *Id.*, p. 47, l. 17 to p. 48, l. 17; *see also* Doc. #20, Ex. S (Statement of Jamar Jones, 2/22/1999), p. 4 (Scott "said that the dude was acting like he had a gun" but that Scott "didn't see any gun"). Moreover, although one witness claimed that Epps's brother had a rifle when dragging Epps to a car, there were no witnesses who stated that Epps himself had a firearm at

---

or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating . . . .

*See also State v. Clark*, 264 Conn. 723, 731 (Conn. 2003) ("It is well settled that under § 53a-19, 'a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack....'").

[18]Scott characterized Jones as a friend whom he had not seen for a number of years and denied ever speaking to Jones about whether Epps had a gun. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 28, l. 14-23; p. 33, l. 7 to p. 34, l. 6

the time of the shooting.[19]  Doc. #20, Ex. N (Habeas Transcript, 5/25/2000), p. 43, l. 16-21.

Furthermore, when Epps's brother left the scene, no gun was found there.  *Id.*, p. 43, l. 26 to p. 44, l. 1.

Schwartz further testified that had the charge remained murder, Scott would have chosen to go to trial and rely on the claim of self-defense.  *Id.*, p. 44, l. 10-15.  When, however, the State offered a reduced charge of manslaughter with a recommendation of thirty-five years and the right to argue for a shorter sentence, Scott was willing to accept the offer.  *Id.*  Schwartz explained that he informed Scott that, although Schwartz would argue for a twenty-year sentence, what Schwartz considered a "reasonable sentence," there were no guarantees.  *Id.*, p. 44, l. 16 to p. 45, l. 2, 11-21.  Thus, according to Schwartz, Scott was on notice that the judge could sentence him to the full thirty-five years.  Schwartz clarified that he never specified that Scott would receive a twenty-year sentence, but rather warned him that he could receive the maximum sentence of thirty-five years.  *Id.*, p. 45, l. 11-21.  Moreover, Schwartz informed Scott that the sentence would be in the sole discretion of the judge, regardless of any assessment by Schwartz as to what would be reasonable under the circumstances.  *Id.*

### 2.    <u>Scott</u>

At the habeas hearing, petitioner Scott summarized the events on the night of the shooting as follows:

> Well, I was aware of  robberies was [sic] going on earlier in the night, so I

---

[19]The arrest warrant indicated that the only thing the victim was found clutching at the scene was $40 in cash.  Doc. #20, Ex. P (Application for Arrest Warrant by Sergeant Thomas Lula, 3/1/1999), p. 3, para. 2.  Moreover, there was no evidence that any weapon other than that employed by Scott was discharged at the scene of the murder.

> was out there and I had a gun on me and an individual approached; he had all
> black on and a rifle on the side of his hand and asked me do I have any drugs?
> I told him no.  And at that time he started to approach me, so I shot him.

Doc. #20, Ex. N (Habeas Transcript, 5/25/2000), p. 6, l. 17-21.  *See also, id.*, p. 7, l. 26 to p. 8, l. 17.

Scott claimed that he was aware that his friends had been victims of an armed robbery at the Greene

Homes Apartments earlier that evening.  *Id.*, p. 5, l. 27 to p. 6, l. 6, 17-21.  He testified that the

robbers were dressed in dark clothing.  *Id.*, p. 7, l. 20-22.  Scott explained that, although he did not

live at the housing complex, he had dealt drugs there and was armed and "hanging out" on the

premises that evening.  *Id.*, p. 26, l. 27 to p. 27, l. 24; p. 34, l. 22-27.  He stated that, although he had

been told by others to get rid of his gun because police were coming to investigate the robbery, he

kept the gun and stayed.  *Id.*, p. 22, l. 16 to p. 23, l. 1.

Scott testified in detail that, on the night of the shooting, he was approached by Epps, who

was wearing dark clothes and holding an M-16 assault rifle at his side.  *Id.*, p. 8, 23-25; p. 23, l. 2

to p. 24, l. 8.  Epps allegedly asked whether Scott had any drugs and Scott responded in the

negative.  *Id*.  At that point, according to Scott, Epps started to lift his rifle so Scott became afraid

and shot him.[20]  *Id.*, p. 22, l. 3-4.  On cross-examination, Scott was asked whether he could have

retreated – *i.e.*, turned and walked into the doorway of the building where he had been standing.

Scott replied, "No, he probably would have followed me.  If he got a gun, it don't matter where you

go.  He got a gun."  *Id*., p. 25, l. 25-26.

Scott admitted at the hearing that when he was arrested by the police, he was indeed in

---

[20]When asked whether he was "afraid that [Epps] was going to shoot" him, Scott
responded, "He might have, yes."  Doc. #20, Ex. N (Habeas Transcript, 5/25/2000), p. 8, l. 13-
14.

possession of the weapon that had killed Epps, but told the police that he had nothing to do with the shooting and that a fictitious person named "James" had given him the gun after this James had shot Epps. *Id.*, p. 17, l. 5-16; *see also id.*, Ex. Q (Statement of Damon Scott to Bridgeport Police, 2/2/1999), p. 3-4, 6 (Scott told police that he received the gun from a "[s]hort dark skinned kid, black male, James [with] braids in his hair, dreadlocks ear length" and that James paid him $105 to "get rid of" the gun for him).

Scott admitted that he fabricated a "phony alibi" by telling the police that he was with his girlfriend, Tanisha Wilson, at her mother's home all during the evening of the shooting.[21] Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 19, l. 27 to p. 20, l. 16; *see also* Doc. #20, Ex. Q (Statement of Damon Scott to Bridgeport Police Department, 2/2/1999), p. 5. Scott also admitted that he was initially untruthful with Schwartz about the events on the evening of the shooting.[22] Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 10, l. 4-13.

---

[21]The police investigated Scott's alibi and determined that Scott's girlfriend did not fully corroborate his story. Doc. #20, Ex. P (Application for Arrest Warrant by Sergeant Thomas Lula, 3/1/1999), p. 5 (describing sworn statement of Tanisha Wilson, given to a Bridgeport police detective on the evening of 2/4/1999, stating that Scott was not with her during the time period when Epps was shot – *i.e.*, he arrived at her mother's home after midnight and only stayed "about twenty minutes before leaving"). At the habeas hearing, Scott confirmed that this was a "phony alibi." Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 19, l. 27 to p. 20, l. 16. *See also* testimony of Schwartz, *id.*, p. 42, l. 23 to p. 43, l. 2 (stating that Scott's girlfriend "didn't corroborate in full everything that he had stated . . . about his whereabouts at the time of the homicide").

[22]Scott stated, in relevant part:

So, when I came back to court a few weeks later, I met Mr. Schwartz. He told me who he was and *at first I told him I didn't do it*, then later on when he called me back to court, I sat down with him in the basement of the court and I explained to him everything that happened that night.

Doc. #20, Ex. N (5/25/2005), p. 10, l. 4-13 (emphasis added).

**C.    Deposition Testimony of Chaka Fagon - State Habeas Hearing - 8/22/2005**

After an extended continuance, the state habeas trial resumed on August 22, 2005, in order that Scott might present for admission into evidence the deposition transcript of witness Chaka Fagon.  Scott had been unable to produce Fagon as a witness on the previous hearing date of May 25, 2005, and thus sought to introduce Fagon's testimony via his deposition of August 15, 2005. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 55, l. 5 to p. 56, l. 4; and Ex. O (Fagon Deposition Transcript, 8/15/2005).   In his deposition, Fagon recounted his version of the events of February 2, 1999, at the Greene Homes Apartments.    Fagon claimed that he himself was robbed by Epps and three others on that evening.  Doc. #20, Ex. O, p. 4, l. 16 to p. 6, l. 2.    According to Fagon, one of the three men accompanying  Epps had a submachine gun and  the others had handguns.  *Id.* at  p. 4, l. 20-23; p. 6, l. 15-19.    Epps allegedly struck Fagon  "with something" during the robbery.  *Id*. at p. 5, l. 15-18; p. 6, l. 10-14.

After the robbery, Fagon went directly to his own home, across the street from the Greene Homes Apartments, and never saw Scott to warn him of the robbery.[23]  *Id.*, p. 8, l. 26 to p. 9, l. 18; p. 10, l. 2-5.   Fagon claimed, however, that everyone looking out the windows at the housing complex must have seen the robbery so "somebody else told  people what happened during the time of leaving the scene when everything happened."  *Id*., p.  9, l. 26 to p. 10, l. 1.    Fagon asserted that "everybody [at that complex] is in everybody['s] business" because it is an "open area."   *Id.,* p. 11, l. 10-14.  He thus suggested that anyone walking by or looking out the window would have known

---

[23]In fact, Fagon testified that he never went back outside until Epps was already dead. Doc. #20, Ex. O (Fagon Deposition Transcript), p. 11, l. 2-5.  Moreover, Fagon did not inform the police officers at the scene that Epps was one of the men who had robbed him earlier in the evening.  *Id.,* p. 11, l. 19-22.

about the robbery that night.  *Id.*

Fagon denied knowing Schwartz and testified that he had never been contacted by either an investigator or Schwartz about Scott's case.[24]  *Id.,* p. 7, l. 2-12.  This testimony was in direct contradiction to that of Schwartz, who testified that he had spoken personally with Fagon in order to investigate Scott's case.  Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 41, l. 22 to p. 42, l. 1.

III.    **STANDARD OF REVIEW**

A.    **Federal Habeas Relief  - 28 U.S.C. § 2254**

Pursuant to  28 U.S.C. § 2254 (a), a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  *See, e.g.,  Cullen v. Pinholster*, No. 09-1088, __ U.S. __ , 131 S. Ct. 1388, 1398, 2011 WL 1225705, at *8 (April 4, 2011).   Because federal habeas relief may only be obtained for a violation of federal law, it "does not lie for errors of state law."  *See Estelle v. McGuire*, 502 U.S. 62, 67(1991) (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).[25]  *Accord Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998)("A federal court conducting habeas review is limited to determining whether a

_____

[24]Relying on the deposition of Fagon, Scott based his petition for habeas relief on the ground that Schwartz misrepresented having investigated his self-defense claim.  In particular, Scott contended that if Schwartz had actually performed a proper investigation into the self-defense claim, Scott would have proceeded to trial and been found not guilty.

[25]  In *Estelle v. McGuire*, 502 U.S. at 67-68, the Supreme Court chose to "reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

petitioner's custody is in violation of federal law."); *Constantopoulos v. Commissioner of Correction*, No. 3:98CV1166 (SRU), 2003 WL 2002769, at *2 (D. Conn. April 16, 2003) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.").

Furthermore, a federal court cannot grant a writ of habeas corpus to a state prisoner on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254 (d)(1)-(2).[26]

With respect to section 2254 (d), "federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). Moreover, "clearly established Federal law" in § 2254 (d)(1) "refers to the holdings, as opposed to the dicta," of the Supreme Court's decisions "as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006)(citing *Williams v. Taylor*, 529 U.S. 362, 412

---

[26]In *Cullen v. Pinholster*, No. 09-1088, __ U.S. __ , 131 S.Ct. 1388, 1398, 2011 WL 1225705, at *8 (April 4, 2011), the United States Supreme Court recently clarified that "review under § 2254 (d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Congress, in drafting the federal habeas statute, "inten[ded] to channel prisoners' claims first to state court." 131 S. Ct. at 1398-99, 2011 WL 1225705, at *8 (citation omitted). Consistent with that policy decision, "[t]he federal habeas scheme leaves primary responsibility with the state courts." 131 S. Ct. at 1399, 2011 WL 1225705, at *8 (citation omitted).

(2000)).

As set forth in section 2254 (d) (1), there are two clauses under which a federal court may issue habeas relief: (1) under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases" or "decides a case differently" than the Supreme Court has "done on a set of materially indistinguishable facts;" or (2) under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case."[27] *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406, 407-08 (2000)).[28] "The focus of [this] latter inquiry is on whether the state court's application of clearly established federal law is *objectively unreasonable*." *Bell*, 535 U.S. at 694 (emphasis added).

"To determine whether a particular decision 'is contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Cullen*, 131 S. Ct. at 1399, 2011 WL 1225705, at *9 (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Then, with respect to the "unreasonable application" clause in section 2254(d)(1), "[i]f the

---

[27] To unreasonably apply the law, the state court decision must be more than incorrect. It must be objectively unreasonable, which creates "a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[28] *See also Cullen*, 131 S. Ct. at 1399, 2011 WL 1225705, at *9 ("To determine whether a particular decision is contrary to then-established law, a federal court must consider whether the decision applies a rule that contradicts [such] law and how the decision confronts [the] set of facts that were before the state court. If the state-court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case." (Internal quotations and citations omitted).

state court 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.'" *Cullen*, 131 S. Ct. at 1399, 2011 WL 1225705, at *9 (citing *Williams*, 529 U.S. at 413). The Second Circuit has instructed district courts that "[i]n determining whether an application was objectively unreasonable, a habeas court does not require that 'reasonable jurists would all agree' that the state courts erred; on the other hand, 'the most important point is that an unreasonable application of federal law is different from an incorrect application." *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000). Therefore, although "some increment of incorrectness beyond error is required . . . the increment need not be great." *Id.* (citations omitted). [29]

Alternatively, pursuant to section 2254 (d)(2), a petitioner may be granted federal habeas relief if the state court made an unreasonable determination of the facts of the case in light of the evidence presented to it in the state court proceeding. Deference, however, is given to the state court's determinations because "under § 2254(e)(1), 'a determination of a factual issue made by a State court shall be presumed to be correct,' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Wood v. Allen,* 130 S.Ct. 841, 845, 175 L.Ed.2d 738, 78 USLW 4072 (Jan. 20, 2010) (quoting 28 U.S.C. § 2254(e)(1)). *See also Cullen,* 131 S. Ct. at 1398, 2011 WL 1225705, at *8 ( "This is a 'difficult to meet,' *Harrington v. Richter*, [No. 09-587], 562 U.S. __ , 131 S. Ct. 770, 786, 178 L.Ed.2d 624 [(2011)], and 'highly deferential standard . . . which demands that state-court decisions be given the benefit of the doubt'")

---

[29]*See also Lurie v. Wittner*, 228 F.3d 113, 128-29 (2d Cir. 2000) ("reasonableness of an application of federal law is judged by an objective standard" – *i.e.*, "federal courts should ask whether the state court's application of clearly established federal law was objectively unreasonable") (citing *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotations omitted).

(citing *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)); *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings . . . are presumed correct"); *Boyette v, Lefevre*, 246 F.3d 76, 88-89 (2d Cir. 2001) (deference or presumption of correctness is afforded state court findings where state court has adjudicated constitutional claims on the merits).[30]

Collateral review of a conviction "is not just a rerun of the direct appeal." *Lee v. McCaughtry*, 933 F.2d 536, 538 (7th Cir. 1991), *cert. denied*, 502 U.S. 895 (1991). Specifically, "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate 'fundamental fairness.'" *Brecht v. Abrahamson*, 507 U.S. 619, 633-34 (1993) (citation omitted). Accordingly, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (1993) (citations and internal quotations marks omitted).

### B.    Ineffective Assistance of Counsel

The United States Supreme Court set forth the applicable standard to review an ineffective assistance of counsel claim in *Strickland v. Washington*, 466 U.S. 668 (1984), *reh'g denied*, 467 U.S. 1267 (1984). Under the two prongs of that standard, in order to prevail the petitioner must first demonstrate that counsel's conduct "fell below an objective standard of reasonableness" established by prevailing professional norms. 466 U.S. at 687-88. Second, petitioner must show that counsel's incompetence caused prejudice to him. *Id.* Petitioner must satisfy both prongs of the test

---

[30]"Reasonable minds reviewing the record might disagree about the [witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 341-42. A district court may not, therefore, " use a set of debatable inferences to set aside the conclusion reached by the state court." *Id.* at 342. Simply because an alternative conclusion might be reached by using such inferences does not warrant granting a federal writ of habeas corpus. *Id.*

20

before a court may grant him federal habeas relief.

Most recently, the United States Supreme Court confirmed the continuing validity of the *Strickland* standard in *Cullen v. Pinholster*, No. 09-1088, __ U.S. __ , 131 S. Ct. 1388, 1403, 2011 WL 1225705, at *12 (April 4, 2011) . The Supreme Court reiterated that, pursuant to *Strickland*, in order to overcome the strong presumption that counsel has acted competently, "a defendant must show that counsel failed to act reasonabl[y] considering all the circumstances" and prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[31] 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (citing *Strickland*, 466 U.S. at 690, 694).[32]

## 1. Counsel's Performance

With respect to the first prong, petitioner must establish "that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To evaluate counsel's performance, the court "must judge the reasonableness

---

[31]The Supreme Court defined such a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome," and specified "[t]hat requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (citations omitted).

[32]The Supreme Court recognized that federal habeas review under *Strickland* is "doubly deferential," requiring a "'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254 (d).'" *Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (citing *Knowles v. Mirzayance*, __ U.S. __, 129 S. Ct. 1411, 1413 (2009)). "Recognizing the 'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," the Supreme Court re-established that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (quoting *Strickland*, 466 U.S. at 690).

of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 688. The court thus reviews the identified "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and then decides whether, "in light of all the circumstances," these acts or omissions fell within "the wide range of professionally competent assistance." *Id.* In so doing, the court must bear in mind "that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Id.* The "court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[33] *Id.*; *accord Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12.

Elaborating on this "strong presumption" in favor of counsel's reasonable performance, the *Strickland* court clarified that "[j]udicial scrutiny of counsel's performance must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. The court must thus avoid using "hindsight" and evaluate counsel's conduct from his perspective at the time of the challenged conduct. *Id.*

The burden then shifts to the petitioner to "overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). After all, "[t]here are countless ways to provide effective assistance in any given case" and "[e]ven the best criminal defense

---

[33]Counsel is presumed to be competent. Thus, "the burden rests on the accused to demonstrate a constitutional violation." *United States v. Cronic*, 466 U.S. 648, 658 (1984).

attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689-90.

*See also Cullen*, 131 S. Ct. at 1406-07, 2011 WL 1225705, at *15 (supporting, pursuant to *Strickland*, 466 U.S. at 689, "the constitutionally protected independence of counsel . . . the wide latitude counsel must have in making tactical decisions").

### 2.   Resulting Prejudice

If the petitioner's claim survives the first *Strickland* prong – *i.e*, the court finds counsel's conduct deficient in that it "fell below an objective standard of reasonableness" – petitioner must still demonstrate sufficient prejudice resulting from counsel's incompetence. *See Strickland*, 466 U.S. at 691-92 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); *Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (same).

Under the "prejudice" prong, in the context of a guilty plea, the petitioner must demonstrate that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In other words, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."[34] *Id.* Assessment of prejudice must include a prediction of the likely outcome at trial. *Id.* In the case of an unexplored affirmative defense or undiscovered evidence, a prediction as to the likely outcome of the trial is relevant to determine whether the defense or evidence would have caused counsel to change his recommendation regarding the plea.

---

[34]*See also Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 (to obtain federal habeas relief, defendant must prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, *the result of the proceeding would have been different*") (emphasis added) (citing *Strickland*, 466 U.S. at 694).

*Id.*

## IV.  DISCUSSION

In the case at bar, it is incumbent on this Court to review the Connecticut Superior Court's

decision in *Scott v. Warden*, No. CV03-0004278-S, 2005 WL 2851559 (Conn. Super. Ct. Sept. 28,

2005), because that decision provides the "last reasoned decision" by a state court on the issue of

habeas relief.[35] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). This Court must thus

determine whether Connecticut Superior Court Judge Stanley T. Fuger's decision was (1) contrary

to, or involved an unreasonable application of, clearly established federal law or (2) based on an

unreasonable determination of the facts in light of the evidence presented.

### A.  Reasonable Application of Clearly Established Federal Law

At the outset, this Court finds that in *Scott v. Warden*, No. CV03-4278-S, 2005 WL 2851559

(Conn. Super. Ct. Sept. 28, 2005), the state habeas court reasonably applied the clearly established

United States Supreme Court precedents of *Strickland v. Washington* and *Hill v. Lockhart* to deny

Scott's petition.[36] *See* 28 U.S.C. § 2254 (d)(1). Specifically, when determining whether it should

"set aside [Scott's] plea of guilty on the ground that his attorney did an inadequate job of

---

[35]As stated *supra*, the Connecticut Appellate Court affirmed in a *per curiam* opinion without further comment. *Scott v. Commissioner of Correction*, 100 Conn. App. 902 (2007). When an appellate court affirms without comment, that court is presumed to have relied on the same grounds as the court below in reaching its decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)

[36]The Supreme Court decision in *Cullen v. Pinsholster* (decided April 4, 2011) post-dates the state habeas court decision at issue (decided Sept. 28, 2005) by approximately five and one-half years and is thus not cited by Judge Fuger. In any event, *Cullen* confirms the application of *Strickland*'s two prongs for the habeas review of an ineffective assistance of counsel claim. *Cullen*, 131 S. Ct. at 1403, 2011 WL 1225705, at *12 ("There is no dispute that the clearly established federal law here is *Strickland v. Washington*").

investigating a potential self-defense claim," the state court properly concluded that "[a]ny claim of ineffective assistance of counsel must satisfy both prongs of the test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 688 [(1984 )], *reh'g denied*, 467 U.S. 1267 . . . (1984)." *Scott*, 2005 WL 2851559, at *4.

The state court further recognized that because the conviction at issue resulted from a guilty plea, the appropriate standard to apply was *Hill v. Lockhart*, 474 U.S. 52, 59-60 (1985), under which the petitioner must "demonstrate that he would not have pleaded guilty" (*i.e.*, would have insisted on going to trial) and that the evidence which his counsel failed to uncover and the defense his counsel failed to present "were likely to have been successful at trial."[37] *Scott*, 2005 WL 2851559, at *5 (citations omitted).

### 1.       Strickland Prongs

The state habeas court carefully applied the two *Strickland* prongs to the relevant facts to hold that Scott failed to demonstrate that Schwartz's conduct was deficient or fell below an objective standard of reasonableness.   As to prong one, the state court determined that it could not "find any deficiencies" in Schwartz's performance because "[h]e clearly conducted an adequate investigation [of the self defense claim], was fully aware of the facts of the case, and managed to negotiate a favorable pretrial settlement of the case." *Scott*, 2005 WL 2851559, at *5.      In reaching its conclusion, the court found that "Schwartz reviewed all of the material provided by the prosecutors

---

[37]The state habeas court explained that "[t]he focus of a habeas inquiry where there has been a guilty plea is the nature of the advice of counsel and the voluntariness of the plea . . . . If a prisoner pleads guilty on advice of counsel, he must demonstrate that the advice was not within the range of competence demanded of attorneys in criminal cases." *Scott*, 2005 WL 2851559, at *4 (citing *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

in this case, had the statements of witnesses, interviewed and met with his client, hired an investigator and interviewed Shaka [sic] Fagon." *Id.* at *4.

As to the second *Strickland* prong regarding prejudice, the state court reasonably applied *Hill v. Lockhart*, 474 U.S. 52 (1985), acknowledging that "the United States Supreme Court . . . articulated a modified prejudice standard for cases in which the conviction has resulted from a guilty plea." *Scott*, 2005 WL 2851559, at *5. The court explained that "*Hill* requires the petitioner to demonstrate that he would not have pleaded guilty, that he would have insisted on going to trial and that the evidence that had been undiscovered or the defenses he claims should have been introduced were likely to be successful at trial." *Id.* (citation omitted).

In applying *Hill*, the state court recognized that "[i]t is not even necessary to consider whether a trial counsel's performance was deficient if the Habeas Court is satisfied that there was no prejudice to the defendant by the actions of the trial counsel in representing the petitioner" because "[a] reviewing court can find against a petitioner on either ground, whichever is easier." *Id.*, at *5 (citing *Strickland*, 466 U.S. at 697).[38]

---

[38]With respect to review of the prejudice component, the United States Supreme Court in *Strickland* clarified:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order *or even to address both components of the inquiry if the defendant makes an insufficient showing on one.* In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . *If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice*, which we expect will often be so, *that course should be followed.*

466 U.S. at 697 (emphasis added).

Having reviewed the facts presented, the state habeas court found that "[w]hile self-defense is a potential claim in [Scott's] case, it is weak and with a small likelihood of success." 2005 WL 2851559, at *4. The court thus determined that "[a]t the time he entered his guilty plea in January 2000, it was prudent for the petitioner to agree to the settlement and enter a plea of guilty." *Id.* at *3. Often times "[r]easons other than the fact that he is guilty may induce a defendant to so plead ... [and he] must be permitted to judge for himself in this respect." *Id.* (citations omitted). "By making the pragmatic decision to plead guilty, even if he believed himself to have acted in self-defense, the petitioner voluntarily chose to forego his constitutional right to a trial in exchange for a limitation upon sentence that allowed him to receive a more favorable sentence." *Id.* "With the agreement, the petitioner will be released from prison at about age 53, rather than facing a *significantly likely possibility that he would die in prison.*" *Id.* (emphasis added). Rather than being prejudiced by his decision, the court surmised that Scott had actually *benefitted* from it by avoiding a likely life sentence.[39]

The state court summarized that "[i]t is clear that the petitioner did not suffer any prejudice as a result of any of the challenged actions or omissions of his trial defense counsel."[40] *Id.*, at *6.

_____

[39]Having determined that Schwartz's investigation failed to yield "any reliable evidence to support the claim of self-defense," the court concluded that it was prudent of Scott to take the plea. In other words, had Scott chosen to go to trial, the state court was of the opinion that it was likely Scott would have been convicted and received a sentence of longer than thirty-years, perhaps even life. As stated *supra*, such findings by a state court are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254 (e)(1).

[40]Based on the testimony at the hearing, the state habeas court doubted the viability of a self-defense claim. Schwartz acknowledged problems that would have arisen had he presented a self-defense claim on Scott's behalf. For example, Schwartz testified that he could not recall one witness who said that Epps had a firearm or any weapon at the time of the shooting. Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 43., l. 9 to p. 44, l. 1. Fagon's deposition testimony concurred in part, stating that Epps was not the one who was carrying the rifle (rather

"Here, the petitioner voluntarily entered into this plea bargain; was ably represented by counsel who did conduct an adequate pretrial investigation; and, he freely made the choice to give up his constitutional right to a trial in order to obtain favorable consideration upon sentencing."[41] *Id.* Scott was thus unable to demonstrate that but for any unprofessional errors by counsel, "the result of the proceeding would have been different." *Id.* Having found Scott's "plea of guilty [to be] knowing, intelligent and voluntary" with the "representation of competent counsel," the state court denied his habeas petition. *Id.* at *6.

---

he allegedly had a handgun) during the robbery. *Id.,* Ex. O, p.12, l. 17-19. Similarly, witness Jamar Jones stated that Scott told him that he knew Epps had no gun. *Id.*, Ex. S, p. 4. In the absence of sufficient evidence that Scott reasonably believed that Epps was "using or about to use deadly physical force" when he approached Scott, a self-defense claim was fatally defective.

Furthermore, even if Epps had been carrying a weapon, Scott could provide no plausible reason for failing to retreat from Epps by going inside the nearby building. Scott merely stated that if he had retreated, Epps "would probably have followed" him. *Id.*, Ex N (5/25/2005), p. 25, l. 23-26.

[41]Focusing on the difficult situation facing Scott during the pre-trial phase, the state habeas court expounded:

[G]uilt, or the degree of guilt, is at times uncertain and elusive, an accused, though believing in or entertaining doubts respecting his innocence, might reasonably conclude a jury would be convinced of his guilt and that he would fare better in the sentence by pleading guilty. *McCoy v. United States*, 124 U.S. App. D.C. 177, 179, 363 F.2d 306, 308 (1966)." *See North Carolina v. Alford*, 400 U.S. 25[,] 33 (1970). The petitioner was charged with several serious charges. Had he gone to trial on this matter and been convicted, he would have faced incarceration for a significantly longer period. It is quite likely that this would have been the remainder of his natural life. His total "exposure" was, therefore, high.

*Scott*, 2005 WL 2851559, at *3.

## 2.    Reasonable Determination of the Facts

For the reasons set forth below, this Court holds that the state habeas court made a reasonable determination of the facts in light of the evidence presented in the state habeas hearings. *See* 28 U.S.C. § 2254 (d)(2). Specifically, in his decision, Judge Fuger supported his factual determination that Scott had not proven "any deficiencies in the performance of Attorney Schwartz" by making specific references to the evidence presented at the hearing and judgments about the relative credibility of the witnesses.

### a.    Ineffective Assistance of Counsel

With respect to Scott's allegation that Schwartz failed to adequately investigate his self defense claim, the state court heard the conflicting testimony of Schwartz and Scott and decided to credit Schwartz's testimony over that of his former client, finding that Schwartz had in fact "hired an investigator," Carl DiProfio, to speak to witnesses regarding a self-defense claim and "personally interviewed Mr. Fagon to seek corroborating evidence of this defense." 2005 WL 2851559, at *2 (¶ 7). [42] The court thus found as follows:

> [T]the evidence presented to this court clearly shows that trial defense counsel did do a more than adequate job of investigating and developing this claim. Attorney Schwartz reviewed all of the material provided by the prosecutors in this case, had the statements of witnesses, interviewed and met with his client, hired an investigator and interviewed Shaka [sic] Fagon. However, his own client was less than forthright with the Bridgeport police

---

[42]Schwartz testified that he hired Carl DeProfio of Case Research International to speak to the witnesses named in the State's disclosure, Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 40, l. 18 to p. 41, l. 13. Schwartz also testified that he personally spoke to Chaka Fagon because Schwartz had represented Fagon's brother at that time. *Id.*, p. 41, l. 22 to p. 42, l. 1. Because Fagon gave contradictory testimony in his deposition, denying that he knew Schwartz or had spoken with him (Doc. #20, Ex. O (Fagon Deposition Transcript), p. 7, l. 2-3), the court clearly concluded that Schwartz's testimony was more credible than that of Fagon.

at the time of his arrest and even with Attorney Schwartz in the early stages of the representation. Consequently, Attorney Schwartz had cause to question his own client's credibility.

*Id.* at *4.

Having determined that Schwartz hired DiProfio and spoke with Fagon, the court deemed Schwartz "fully aware of the facts of the case" and able to "negotiate a favorable pretrial settlement" on his client's behalf. *Id.* at *5. In sum, the court found itself unable to "find any deficiencies in the performance of Attorney Schwartz." *Id.*

By weighing the testimony of the witnesses, Judge Fuger rightfully exercised an essential duty of a hearing judge, namely to assess witness credibility when there is conflicting testimony. *See, e.g.*, *Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003) ("Credibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing."). Furthermore, as stated *supra*, even if reasonable minds could disagree with the state court's determination regarding witness credibility, that does not suffice to supersede the trial court's credibility determination on habeas review. *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006). A district court may not, therefore, " use a set of debatable inferences" to set aside the state court's conclusions. 546 U.S. at 342. Evaluating the testimony at the hearing, the state court chose to credit the testimony of Schwartz over that of Scott or Fagon[43] and I find no basis to conclude that

---

[43]Fagon's testimony was suspect, for example, in that he testified that on the night Epps robbed him, there were three of four other individuals who participated with Epps in the robbery but none of these men was Epps's brother. Doc. #20, Ex. O, p. 13, l. 1-20. Fagon's testimony conflicts with the witness statement that Epps's brother was the one who was carrying a rifle while he was trying to drag Epps's body away. *Id.*, Ex. N (Habeas Transcript), Schwartz testimony, p. 43, l. 16-21.

Furthermore, Fagon's description of the model of the rifle held by one of the robbers lacked credibility in that he described the rifle as "either an M-16 or . . . an M-1 rifle," two

it was unreasonable in so doing.

### b.  Prejudice

With  respect to prejudice, the state court reasonably determined that Scott "did not suffer

any prejudice as  a result of any of the challenged actions or omissions of his trial defense counsel."

2005 WL 2851559, at *6.   Particularly, with respect to Scott's self-defense claim, the court found

the claim to be "weak and with a small likelihood of success" had the case proceeded to trial.  *Id.*

at *4.  "Schwartz  was [thus] unable to develop any reliable evidence to support the claim of

self-defense" and turned his attention "to convinc[ing] the state to enter into a plea bargain" under

which Scott would plead guilty to manslaughter rather than murder.[44]  *Id.*   In accepting the plea

agreement*,* "the petitioner will be released from prison at about age 53, rather than facing a

significantly likely possibility that he would die in prison."  *Id.* at *3*.*

In finding the self-defense claim "weak," with "a small  likelihood of success," the court

―――――――――――――――

weapons which are very different in appearance.  Doc. #20, Ex. O, p. 5, l. 13-25.

Other problems arising in Fagon's testimony include his admissions that:  he failed to
identify Epps as one of the robbers to the police; *id.*, p. 11, l. 19-25;  and he never spoke to Scott
to inform him of the robbery on the evening of the shooting, but rather went directly home after
being robbed, *id.*, p. 6, l. 20 to p. 7, l. 1; p. 8, l. 25 to p. 9, l. 18; p. 10, l. 2-5.

[44]In its findings of fact, the court stated:

[T]he petitioner asserted that he had shot the victim in self-defense because he
thought that he was coming to rob him. Attorney Schwartz hired an investigator and
personally interviewed Mr. Fagon to seek corroborating evidence of this defense.

. . . Ultimately, Attorney Schwartz was unable to develop any reliable evidence to
support the claim of self-defense and was able to convince the state to enter into a
plea bargain that saw the petitioner pleading guilty to manslaughter in exchange for
a thirty-five year recommendation with a right to argue for less at sentencing.

*Scott*, 2005 WL 2851559, at *2.

cited its lack of confidence in Scott's veracity.   Specifically, the court noted that Scott had initially made false denials of any involvement in the shooting of Epps, both in a sworn statement to the Bridgeport police and in multiple conversations with Schwartz.[45]   The court thus described Scott as  "less than forthright" with both the Bridgeport Police at the time of arrest and Schwartz in the early stages of representation.[46]  *Id.*, at *4.

Moreover, it was reasonable for the state court to conclude that Scott's self-defense claim was "weak" in light of the evidence presented.   Fagon's proffered testimony, even if credited, dealt with events *prior to*, rather than contemporaneous with, Scott's shooting of Epps.  Therefore, even if Scott had chosen to go to trial and Schwartz had called Fagon as a witness, it is doubtful that Fagon's testimony would have bolstered Scott's self defense claim.   Fagon admittedly fled the Greene Homes Apartments immediately after being robbed earlier in the evening and never spoke with Scott that day.   Therefore, Fagon could provide no evidence of the circumstances existing at the time Scott shot Epps – *i.e*, no indication of whether Scott knew about the robberies that day, no actual knowledge of whether Epps was truly armed *at the time he approached Scott* later that

---

[45]Only after his girlfriend destroyed his proffered alibi (*i.e.*, that he was with her) did Scott admit that he had actually shot Epps.   It was then that he suggested the self-defense claim.

[46]Scott also lied during questioning by the Bridgeport Police on February 3, 1999, when he denied knowing any "Shaka."  Doc. #20, Ex. Q (Statement of Damon Scott to Bridgeport Police Department, 2/2/1999), p. 6.   According to Jamar Jones, Scott actually sold drugs for "Shaka" [sic] Fagon.  *Id.*, Ex. S (Statement of Jamar Jones, 2/22/1999), p. 5.

Similarly, Scott denied speaking to Jamar Jones for several years and specifically claimed he never spoke to Jones after shooting Epps.  Doc. #20, Ex. N (Habeas Transcript, 5/25/2005), p. 33, l. 7-27; p. 34, l. 1-6.  According to Schwartz, in discussing a self-defense claim for Scott, Schwartz recognized that "if the jury chose to believe Mr. Jones" ( *i.e.*, that Scott told Jones he knew that Epps had no gun), that would have put a "serious dent" in Scott's self-defense claim." *Id.*, p. 48, l. 10-13.

evening, and no indication of whether there was anything blocking Scott's ability to retreat at that time. In sum, Fagon's testimony could not establish the prima facie requirements for the use of physical defense under Connecticut General Statutes § 53a-19 (a).

Countering self defense were the facts that no weapon was found in Epps's possession (only $40 were clutched in his hand), no gun other than Scott's had been discharged at the scene, and fully ten bullets had been fired at Epps. These facts, combined with Scott's acknowledged history of untruthful statements to both the Bridgeport Police and his own counsel, mitigated against a finding of self defense.

Granted, at the state habeas hearing, the Court was confronted with conflicting testimony from the witnesses as to whether Schwartz actually interviewed Fagon. Courts often, however, are called upon to assess witness credibility – to decide whom to believe – in order to determine the facts of a particular case. Such credibility assessments are crucial in the role of hearing judge. Schwartz testified that, upon reviewing Scott's file, it was his recollection that he had hired Carl DeProfio to investigate and obtain witness statements and that Schwartz personally spoke with Fagon. Absent clear and convincing evidence to the contrary, I find that the state court's determination that Schwartz performed adequately in investigating the self-defense claim, causing no prejudice to Scott, was reasonable in this case. Such a determination by a state court is entitled to the presumption that it is correct.

As stated *supra*, pursuant to 28 U.S.C. § 2254 (e)(1), in a federal habeas proceeding, the state court's "determination of a factual issue . . . shall be presumed to be correct" and it is then the petitioner's burden to rebut the presumption of correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In the case at bar, the state court considered Scott's ineffective assistance

of counsel claim, employed the clearly established federal law, and ruled against Scott on the merits. The court supported its factual determinations with references to the evidence presented at the hearing and judgments about the relative credibility of the witnesses. Moreover, the court found no clear and convincing evidence that there were "any deficiencies in the performance of Attorney Schwartz." *Id.* at *5. Based on the effective assistance of Schwartz and Scott's predictably small likelihood of success with a self-defense claim, the state court properly denied Scott's request for habeas relief.

## V.    CONCLUSION

After careful review, I find that the state habeas court reasonably applied the clearly established federal law of *Strickland v. Washington*, 466 U.S. 668 (1984), *reh'g denied*, 467 U.S. 1267 (1984), and *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), to the facts of Scott's case. Connecticut Superior Court Judge Fuger analyzed the testimony presented to conclude that Scott failed to prove that Schwartz's performance as counsel fell below an objective standard of reasonableness, established by prevailing professional norms, or caused any prejudice to Scott.[47] The state court's decision was thus not "contrary to" or an "unreasonable application of" the clearly established law of the United States Supreme Court. 28 U.S.C. § 2254 (d)(1).

Furthermore, I conclude that the state court's factual determination that Scott received the effective assistance of trial counsel is not "an unreasonable determination of the facts in light of the evidence presented" at the habeas hearings. *See* 28 U.S.C. § 2254 (d)(2). The court carefully

---

[47]Rather, Judge Fuger found that Schwartz's performance as counsel, including his investigation into Scott's self-defense claim, was "competent," lacking "any deficiencies," and did not cause Scott to "suffer any prejudice as a result." *Scott*, 2005 WL 2851559, at *5-6.

analyzed the conflicting testimony of the witnesses and made the necessary credibility assessments to conclude that Schwartz "did do a more than adequate job of investigating and developing this [self-defense] claim." *Scott v. Warden*, 2005 WL 2851559, at *4. Similarly, and alternatively, the state court examined the facts to find that Schwartz's performance, including his investigation of the self-defense claim, benefitted, rather than prejudiced, Scott in the outcome of his case.[48] Scott has failed to present "clear and convincing evidence" to rebut the presumption that the state court's factual determinations are correct. *See* 28 U.S.C. § 2254 (e) (1).

In sum, the state court's determination that Scott was afforded the effective assistance of counsel is not an unreasonable application of the clearly established federal law to the apposite facts in this case. Accordingly, Scott is not entitled to federal habeas relief.

In closing, the Court notes that Damon Scott was only 18 years old when the Connecticut Superior Court sentenced him to a 35-year term of incarceration. Undoubtedly he regards this sentence as unjustly long. But the sentencing court regarded itself as passing a sentence agreed to by the prosecutors and Scott in the parties' plea agreement; and the crime of murder is one of the

---

[48]As stated *supra*, there was considerable evidence in the state court record that Schwartz was "unable to develop any reliable evidence to support [Scott's] claims of self-defense." *Scott*, 2005 WL 2851559, at *2. For example, there was no reliable proof that Epps was carrying a weapon on the night of the shooting, no other firearm was located or discharged at the scene, and Scott provided no persuasive explanation as to why he failed to retreat into the nearby building. Rather, Scott's series of lies to the police and his counsel called the veracity of his self defense claim into question. Moreover, the crime scene and autopsy report showed that Scott fired fully ten bullets (four of which entered Epps) – a surprisingly large number of gunshots for the purposes of "self-defense."

In light of this "weak" self-defense claim, the state court concluded that Schwartz aided Scott by "convinc[ing] the state to enter into a plea bargain that saw the petitioner pleading guilty to manslaughter in exchange for a thirty-five year recommendation with a right to argue for less at sentencing." *Scott*, 2005 WL 2851559, at *2.

most serious known to the law.  The case is of paramount importance to both the State and Scott.

Scott's post-sentencing efforts to set aside the plea agreement, and to assail as contrary to the

evidence the jury's likely rejection of his self-defense theory, have failed during the course of what

appear to be thorough and meticulous state court proceedings, including evidentiary hearings

generated by Scott's state habeas petitions.  Having been denied post-sentence relief by the state

courts, Scott now files a habeas petition in this federal court.  That petition fails at the outset,

principally because current federal statutory and case law severely limit the grounds upon which

federal courts may grant habeas relief to state prisoners, in keeping with Congress's policy decision

to channel state prisoners's claims to state courts and leave primary responsibility for habeas relief

with the state courts.  For the reasons stated *supra*, Scott does not and cannot identify any basis in

federal law which would justify this Court's granting him relief of any sort.

For the foregoing reasons, Scott's Petition for a Writ of Habeas Corpus (Doc. # 1) is

**DENIED**.  Because Scott has not demonstrated the denial of a constitutional right, a certificate of

appealability will not issue in this case.  The Clerk is hereby directed to enter judgment and close

the case.

It is SO ORDERED.

Dated: New Haven, Connecticut
August 5, 2011

                                        */s/Charles S. Haight, Jr.*
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge